Good morning, Your Honors. My name is Howard Davis. I represent Petitioners Raphael, Larissa, and Nari Petrosyan. And I'd like to reserve about two minutes for rebuttal. I think the first thing I want to focus on here is the board's denial of the motion to reopen. And one of the things of concern here is that the board was just, without, just didn't really give much of a discussion here as to its conclusions that there was no, that the government had not imputed any political opinion to Mr. Petrosyan. And it just simply referred to the record without really giving any indication of what was in there. And all its conclusion was is that somehow the government was just interested in Mr. Petrosyan for his talents as a hypnotist. I had some feeling that the board might be coming to that conclusion from the original decision. In other words, if you read the immigration judge's decision in your first claim, that decision really doesn't talk at all about political imputation at all. It only talks about the bad things that happened, but not the why. Right. And this is actually one of the, I think, one of the problems with the record is that the first time that actually anyone talks about nexus here with regard to Mr. Petrosyan is that the motion reopened. And that's, and as the, and this is the government's brief, and this is what you're, you know, noting, it's a government brief rightly noted, is that the immigration judge didn't really talk about nexus as it applied to Mr. Petrosyan. Well, did the motion to reopen have anything new with regard to the on account of requirement, on account of political? Yes. And this is one of the things is, is that the whole on account of here is it's, it's all very, it's all circumstantial, which is allowed under the, under, for example, Delosos and other. And when you take a look at a case like Delosos, I mean, that was all circumstantial there. I mean, nobody went up to Mr. Delosos saying that we're doing all these things because of A, B, and C reason. And this is what we, what we have here. And one of the, the things about the new information was, was the brutality of the, of the police in attacking Areik Petrosyan, Mr. Petrosyan's relative. And they were specifically asking for, for Rafael Petrosyan. I mean, that suggests it's not just about the government looking for Mr. Kreskin here or something for, for hypnosis, but there was, there was something that had, that did definitely relate to the on account of. You're relying on the fact that they wouldn't, as you said, I think, in your papers, that they wouldn't beat him up that badly just in order to get a hypnotist. Correct. And, and, and this is, I think, one of the things that, that bothers me about the board's decision. And then, and then when you take a look at, in the context of the case of the whole, and is that, if you take a look at the, the main events that precipitated Mr. Petrosyan's departure were the events of the, of the, of the killings in the Armenian parliament in the end of October of 99. This is when the, the pressure on Mr. Petrosyan to use his hypnotic powers to get people, suspects to confess to, to, to their involvement in this. And, you know, and, and he, and he tries to evade them. He tells the authorities that this can't be done. And even prior to his departure from Armenia, he goes on, he's on a television program in which he publicly talks about the, this whole thing with the, the government's involvement in trying to get him to hypnotize people and which he says that he felt was part of a government cover up. So, I mean, he's out there giving his opinions that, and also through his actions, trying to hide from them, from the authorities in, in the month of January that clearly indicate that he does not want to cooperate with the government in covering up something. And this is inherently a political act that the, that the, the government is, is doing. And, and in fact, at, at certain instances during the time of his hiding, the authorities are, are hounding his wife and asking about, and asking him about Mr. Petrosyan's whereabouts, threatening them. They threaten her that, you know, things will not be good. They even, during an interrogation, threaten him that if he, you know, that things will, that his, that his family will come to harm if he, you know, continues to evade them. And one of the connections between what happened just prior to his departure and then the attack on his relative a couple of years later is there's a part where just before he, he leaves where he says that, you know, he tells them that he's, you know, going on tour and that he promises to return. And then when he was interrogated after he came out of hiding in January, he promised that he would return after going abroad. And he was warned that if he hides from them, then, then his family will definitely be in trouble. So he's given a threat. And then eventually the proof is in the pudding. He doesn't return. They go to, the police go to his, his residence because that's where his nephew was staying. And then they brutalized the, the nephew. So I think if you take a look in the context of the whole, that, you know, and we take a look at case like Borgia, like Borgia, where, I guess Borja, Borja, I mean, I, yeah, it should be Borja, where they talk about the escalating nature of what occurs. Or in, in that case, they refer to extortion plus. I mean, here it's hypnosis plus, and I mean, you take a look at the escalating nature of, of the governments trying to go after Mr. Petrosian. And when you take a look at all the circumstantial evidence, I mean, under a substantial evidence standard, which, you know, would be for the underlying case, I mean, I, a reasonable fact finder would be compelled to find that at least one of the, of the, you know, the, the, the, the people who are behind the, the, the legal experts are the ones who, who are actually the persons behind the abuse. The motives of the government is that it's on account of political opinion. And I would say that for the purposes of motion reopen, that the, the board definitely abuses discretion in really not taking a look at the, at the full record and just kind of flicking it off with a very terse, you know, one, one liner. And more is demanded of that in, let's say, in a case like Malta. You have to take a look in context of the whole. And I'm, I see I have about two minutes left. You want to reserve? Yeah, unless you have any more questions. No. Thank you, counsel. May it please the court. My name is Rebecca Nyberg. I'm here on behalf of the respondent, the U.S. Attorney General in this case. Basically, what we're talking about here is substantial evidence supporting both the BIA decision and the IJ's decision, both in respects to the motion to reopen denial and the underlying merits case. In this case, an asylum officer, an immigration judge, and the board all decided that the petitioners in this case were not eligible for asylum. And then the board subsequently decided that even with this new evidence that was supposedly being put in front of them, that there was nothing that had changed from their opinion. And, you know, petitioner's counsel would dismiss this one liner as something almost improper. But what the board was really doing was saying that the new evidence being presented didn't change the underlying facts. There was no difference between the underlying opinion and the new evidence that suggested that the petitioners were being persecuted on the basis of one of the five enumerated categories, specifically political opinion. The most analogous case that has already been decided is the Eli Zacharias case. We have a recruitment. The government wants Mr. Petrosian to come and interrogate suspects, basically, or help in the interrogation of suspects, and he refuses. That refusal does not constitute a political opinion. How do you deal with the Borja and Briones cases in which we had a forced recruitment of individuals in the Philippines? And we held if you have essentially an extortion plus, that can rise to the level of past persecution on account of political opinion. In other words, there's an imputed political opinion that you're anti-government if you don't cooperate. Your Honor, we would say that there is no political opinion here. The government has made itself clear, the Armenian government has made itself clear, that it is searching for Mr. Petrosian because of his abilities as a hypnotist. There are many examples of how petitioner had gone out and made his view clear. He appeared on state-run television and was then allowed to leave the country. He went in exile for a month, came back, nothing happened to him. He lived in Armenia a month after getting his U.S. visa. That plus standard simply doesn't exist here. Why doesn't it go to the evidence that he tendered in the motion to reopen? In other words, it seems to me the evidence that was tendered in support of his motion to reopen goes to that very issue, as whether or not there is a, as Mr. Davis put it, escalating pattern here of attempting to reopen. It seems to me that there is an imputed recruitment that finally culminates in an imputation of an anti-government opinion. Well, Petitioner's Counsel would have us believe that had Mr. Petrosian been at that apartment instead of the nephew, that Mr. Petrosian would have been subjected to similar abuse. And there's simply no connection that's been presented that that is true. Unfortunately for those living in Armenia, police brutality for suspects is quite common. You know, the police were coming to Mr. Petrosian's apartment, treating the nephew as a criminal suspect at that point, having, or at least we can, you know, extrapolate that he was being viewed as a suspect and being subject to the police brutality that is normally reserved for those detainees, those criminal. We don't have any evidence, do we, that that's what the police were about? No, and nor do we have any evidence that the police were seeking Mr. Petrosian based on anything but his abilities as a hypnotist. In many of these Recruitment Plus cases, you have the government coming and saying, you know, we believe you're working for the enemy, we believe you're against us. None of those sort of statements were made here. Did he have, in the original application, there was mention of that classic organization that he belonged to. Was there inquiry into that by any of the authorities? We've seen nothing in the record to indicate that, you know, any sort of political opinion was imputed, or even, you know, his television statements were used against him as a political opinion. And if you look to those television statements, in the record what it says is he said that they just weren't using the right methods, he wasn't the right man for the job, they should be using truth serum or, you know, something that would be more effective. He wasn't coming out and saying, you know, the government is wrong for interrogating these people. He's just saying, this isn't the way to go. There are better ways to achieve your objective instead of using me, which ties back into, you know, the government is not trying to find him because he has said, you know, he's not the right man for the job. He hasn't said that he is against the government or against the government's position, but basically because the government thinks that he could be an aid to them in interrogating suspects. And that usefulness, as a hypnotist, does not qualify as a political opinion. What do we do with our cases that indicate that if you repeatedly arrest someone and hold them and never charge them, that we presume that there was no foundation or reason to hold them the first instance, except for, you know, the fact that he's a hypnotist? Your Honor, we simply don't have anything like that in this case. Well, he's arrested a number of times, right? Taken in, questioned, right? That was not clear to me in the record, Your Honor. The only thing that was clear to me in the record was that. Well, here it is, the question. Sir, you need to be specific. Were you ever beaten up and were you ever put in jail? Yes, on several occasions. I was taken in 1999, starting in 2000. I was hiding in Vermont because of the fact that my family was suffering. So he says he was taken into custody. If you read the transcript as a whole, it seems that the government was taking him in as a, I guess, almost a job interview, a recruitment tactic, saying, you know, please come in and, you know, speak with us. Please come in and tell us, you know, how you could be helpful. Please help us in these interrogations. He wasn't, there's nothing in the record to indicate that he was truly being detained as some sort of criminal detainee or, you know, anything of that nature. And indeed, the country reports submitted in this case support the idea that political dissidents are not being imprisoned, are not being killed. They're simply not that climate within Armenia. So not only is the, I guess, the subjective prong kind of in question, the objective prong of the asylum case is in question because that's simply not the country condition within Armenia at this time, nor was it, you know, throughout the past seven, eight years. Well, the BIA didn't rely on that in denying the motion to reopen, though, did it? Your Honor, they simply rested on the record as it stood, as the BIA decision as it had already been entered. So we really can't consider what we think might be changed country conditions in evaluating at least the motion to reopen, right? That's true, Your Honor, although the government would submit that there are no changed country conditions in any case. And the IJ didn't rely on that particularly, I didn't think, in the underlying case either, right? No, Your Honor. I mean, I don't think that there's a difference between political opinion and any, quote-unquote, persecution that could have occurred. Basically, what we have here is a worried man without any sort of basis for that worry besides, you know, this one incident with his nephew, which still has no connection to a political opinion. The only thing it has connection to is the government seeking him out for his services as the hypnotist. And that simply does not qualify it as a political opinion. If you look to certain other cases with political neutrality, the Sankhab case is an example. Political neutrality only counts if that opinion is dangerous in the country as a whole. There's nothing that's been submitted, there's nothing in the record that says Armenian politics don't allow you to have a neutral opinion. It's, you know, it's got a free media. There's, I guess, some self-censorship of journalists that appears in the country conditions, but there is an independent media that is operating. You know, we do get a lot of political asylum cases from Armenia. This isn't the first. And at least if we look at the other cases in which we evaluated, it would be hard to say there's no political, that there's political harmony in Armenia. Well, not to say that, you know, everything is great in Armenia. No, but I mean, we've awarded relief in other Armenian cases. So I think it would be remiss of us to say there's political harmony in Armenia and nobody's getting persecuted on account of opinion, it seems to me. The question in this case is whether or not his neutrality or resistance to the government is sufficient to constitute an opinion. Right? Well, Your Honor, in the other cases, I mean, I can imagine that there was some sort of actual political opinion that was being expressed either through the media or elsewhere. Yes, well, I'm just reacting to your statement that there's, that the country conditions have changed. So there's essentially, if I took, maybe I misinterpreted your argument, that there was really, there's really no political, there aren't any political problems in Armenia. Your Honor, I did not mean to insinuate that there are no political problems in Armenia. The argument is that political neutrality is not something that is regularly punished in Armenia. And Petitioner has not here actually made some sort of political statement. The only statement that he's made is the one on television where he said they're just not going about it the right way. Not I disagree with you, but just that you're not doing it correctly. So in the Senga case, it said political neutrality, not a political position, was only a political opinion for the purposes of the asylum statutes if that political neutrality was in and of itself dangerous.  Any further questions? No. Thank you, Counsel. Just a couple of things I just wanted to call the Court's attention to when I'm referring to the first administrative record for 0372959, page 213, which is an attachment to the asylum application. And he talks about on that page that members of the Public Safety Committee came to his house many times in November and December of 1999. And so then he talks about, he says in the middle of the paragraph, however, my wife and son were constantly being followed and I decided to, quote unquote, return. When they saw me return in this latter half of January of 2000, they would not leave me alone. In the first one occasion, they forcefully escorted me to the committee where I met with the officer who threatened me. If I did not carry out their request, things would turn sour and warn me not to go away again. And also on that program that he appeared on before he left, and it's in 135 of the first record, he said, that his whole appearance on that show was political. He said that he felt that the government in, during that program, that the government was trying to cover up what went on with the killings in the Armenian parliament. And so I think, again, that's, I mean, he pretty much, it's not just, you know, he didn't want to take a stand. He did take a stand. Anyway, thank you. Roberts. Thank you, Counsel. The case, as heard, will be submitted for decision. Thank you both for your arguments. We'll proceed to the next case on the argument calendar, which is Kunkler v. Muntz.
judges: Canby, Thomas and Conlon